# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**DELTONA TRANSFORMER CORPORATION,**

                **Plaintiff,**

**v.**                                           **Case No:   6:19-cv-308-Orl-41LRH**

**THE NOCO COMPANY,**

                **Defendant.**

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT:**

    This cause came on for consideration without oral argument on the following motion filed herein:

| | |
|---|---|
| **MOTION:** | **DEFENDANT'S MOTION TO DISMISS OR, IN THE ALTERNATIVE, MOTION TO STAY (Doc. 12)** |
| **FILED:** | **March 7, 2019** |

**THEREON** it is respectfully **RECOMMENDED** that the motion be **DENIED**.

## I.      Background

    The Deltona Transformer Corporation (Plaintiff) is a Florida corporation that designs, manufactures, and sells batteries and battery-related products for the automotive, motorcycle, and power sports industries.  (Doc. 1 at ¶¶ 2, 7-8).  The Plaintiff has advertised and sold its battery products under four BATTERY TENDER and DELTRAN BATTERY TENDER trademarks (collectively, the Marks) for more than twenty-five years.  (*Id*. at ¶¶ 8-10).

The Noco Company (Defendant) is an Ohio corporation with its principal place of business in Ohio.   (*Id.* at ¶ 3).   The Defendant sells battery-related products that directly compete with the products that the Plaintiff advertises and sells under the Marks.   (*Id.* at ¶ 26).

This case primarily stems from the Defendant's multi-year marketing campaign of its battery-related products on Amazon.   (*Id.* at ¶¶ 28-46).   The advertisements at issue included "tender" or "battery tender" in their taglines and appeared when a user included the phrase "battery tender" in his or her search.   (*Id.* at ¶¶ 31, 35, 37, 41, 44).   The Plaintiff alleges that the Defendant was not authorized to reference "tender" or "battery tender" in the advertisements and, by doing so, infringed the Marks.   (*Id.* at ¶¶ 27-28).   Each time the Plaintiff learned of the unauthorized advertisements, the Plaintiff would contact the Defendant and demand that it cease using the "tender" and "battery tender" Marks.   (*Id.* at ¶¶ 33, 36, 42, 45).   Each time, the Defendant would respond by removing the offending advertisement.   (*Id.* at ¶¶ 34, 37, 43, 46).   However, shortly after the advertisement was removed, the Defendant would place a new, slightly altered advertisement on Amazon that again mentioned "tender" or "battery tender" in the tagline.   (*Id.* at ¶¶ 35, 37, 41, 44).

In 2016, the Defendant expressed an interest in purchasing the Plaintiff's assets, including the Marks, in order to "carry[] on the legacy and passion of the Battery Tender brand."   (*Id.* at ¶ 38).   The Plaintiff declined the overtures, which allegedly led the Defendant to place additional advertisements on Amazon that used the Marks to refer to the Defendant's own brand "in an effort to bootstrap its products to and benefit from the selling power of [the Plaintiff's] brand."   (*Id.* at ¶¶ 39-40).   However, after December 19, 2018, it does not appear that the Defendant placed any further unauthorized advertisements on Amazon using the words "tender" or "battery tender."   (*Id.* at ¶¶ 46-47).

Instead, the Defendant has continued to use the Marks elsewhere to advertise its products. (*Id*. at ¶¶ 47-48).   For example, the Plaintiff points to a message that appeared on the Defendant's website on January 31, 2019 which stated, in relevant part, that the Defendant's "chargers are also battery tenders/maintainers."   (*Id*. at ¶ 48).[1]

The Plaintiff alleges that the Defendant's unauthorized use of the Marks in its marketing campaigns is likely to cause confusion among consumers as to the origin of the Defendant's products, and is a deliberate attempt to trade on the goodwill and reputation of the Marks to divert prospective customers to the Defendant's products.   (*Id*. at ¶¶ 50-51).   As a result, the Plaintiff filed this action asserting the following claims against the Defendant: Count I – trademark infringement in violation of Section 32(a) of the Lanham Act, 15 U.S.C. § 1114(1); Count II - false designation of origin and unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); Count III – common law trademark infringement; and, Count IV – violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 *et seq*.   (*Id*. at 13-16).

The Defendant has moved to dismiss the case for want of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2).   (Doc. 12 (Motion to Dismiss)).   Alternatively, the Defendant requests that the case be stayed pending the resolution of a related cancellation proceeding currently before the Trademark Trial and Appeal Board of the United States Patent and Trademark Office (TTAB). (*Id*.).   Finally, in the event the Court does not dismiss or stay the case, the Defendant requests that the case be transferred to the United States District Court for the Northern District of Ohio.   (*Id*.). In support of these arguments, the Defendant filed an affidavit from its owner and president,

---

[1] The Plaintiff has not identified any other specific instances in which the Defendant used "tender" or "battery tender" in any advertising or marketing.   (*See* Doc. 1).   Further, the Plaintiff has not alleged that the Defendant included the words "tender" or "battery tender" on any of its products.   (*See id*.).

Jonathan Nook (Doc. 12-1), its standard reseller agreement (Doc. 12-2), and its petition to cancel one of the Marks at issue in this case (Doc. 12-3).

The Plaintiff has filed a response in opposition, arguing that personal jurisdiction exists in Florida, that the TTAB proceedings do not warrant a stay of the present litigation, and that venue is proper in this Court.   (Doc. 27).   The Plaintiff relies upon screenshots from the Defendant's website and social media webpages (Docs. 28-1; 28-2; 28-3; 28-4; 28-5), and screenshots from various webpages showing the location of retailers in Florida that sell the Defendant's products (Docs. 28-6; 28-7; 28-8; 28-9; 28-10; 28-11; 28-12; 28-13; 28-14).   The Motion to Dismiss was referred to the undersigned, and the matter is ripe for review.

## II.    Analysis

The Defendant raises three distinct arguments: 1) the Court lacks personal jurisdiction over the Defendant; 2) the case should be stayed pending the TTAB's resolution of the cancellation proceeding; and 3) the case should be transferred to the Northern District of Ohio.   (Doc. 12).   The undersigned will address each argument in turn.

### A.  Personal Jurisdiction

A plaintiff claiming that the Court has personal jurisdiction over a nonresident defendant bears the initial burden of alleging sufficient facts in the complaint to establish a *prima facie* case of personal jurisdiction over the defendant.   *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1274 (11th Cir. 2009).   A *prima facie* case is established if the plaintiff alleges enough facts to withstand a motion for directed verdict or judgment as a matter of law.   *Meier ex rel. Meier v. Sun Intern. Hotels, Ltd.*, 288 F.3d 1264, 1269 (11th Cir. 2002).   If the defendant challenges jurisdiction by submitting affidavits containing specific averments contradicting the plaintiff's allegations in support of personal jurisdiction, the burden shifts back to the plaintiff to produce evidence

supporting the existence of personal jurisdiction.  *United Techs.*, 556 F.3d at 1274.  "Where the plaintiff's complaint and supporting evidence conflict with the defendant's affidavits, the court must construe all reasonable inferences in favor of the plaintiff."  *Meier*, 288 F.3d at 1269.

A court undertakes a two-step inquiry in determining whether it can exercise personal jurisdiction over a nonresident defendant.  *Cable/Home Communication Corp. v. Network Productions, Inc.*, 902 F.2d 829, 855 (11th Cir. 1990).  First, the Court must determine whether the forum state's long-arm statute provides a sufficient basis for personal jurisdiction.  *Sculptchair, Inc. v. Century Arts, Ltd.*, 94 F.3d 623, 626 (11th Cir. 1996).  Second, if the Court finds that personal jurisdiction exists under the forum state's long-arm statute, the Court "must determine whether sufficient minimum contacts exist between the defendant[ ] and the forum state so as to satisfy traditional notions of fair play and substantial justice under the Due Process Clause of the Fourteenth Amendment."  *Id.* (internal quotation omitted).

### 1.  Florida's Long-Arm Jurisdiction

Florida's long-arm statute (which both parties agree applies to this case) provides for both general and specific personal jurisdiction.  *See* Fla. Stat. § 48.193(1)-(2).  General personal jurisdiction exists when a defendant "is engaged in substantial and not isolated activity within this state . . .  whether or not the claim arises from that activity."  *Id.* § 48.193(2).  "General personal jurisdiction is based on a defendant's substantial activity in Florida without regard to where the cause of action arose."  *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1352 (11th Cir. 2013) (citing *Oldfield v. Pueblo De Bahio Lora, S.A.*, 558 F.3d 1210, 1220 n.27 (11th Cir. 2009)). Specific jurisdiction, on the other hand, "authorizes jurisdiction over causes of action arising from or related to the defendant's actions within Florida and concerns a nonresident defendant's contacts with Florida only as to those contacts related to the plaintiff's cause of action."  *Id.*

The parties appear to agree that the Plaintiff is only asserting specific personal jurisdiction over the Defendant under Fla. Stat. § 48.193(1)(a)(2) – the "tortious acts within Florida" provision – based on the Defendant's allegedly tortious actions, *i.e.*, trademark infringement, within the state. (*See* Docs. 12; 27).[2]   The Defendant contends that it did not commit a tortious act in Florida because it did not directly communicate the Amazon advertisements or the message on its own website into Florida, and therefore § 48.193(1)(a)(2) cannot be satisfied.   (Doc. 12 at 8-9).   In response, the Plaintiff contends that the Defendant's infringing marketing campaigns are enough to satisfy the requirements of § 48.193(1)(a)(2) because they were accessible by customers in Florida via a national website and injured the Plaintiff in Florida.   (*Id*. at 5-7).[3]

The reach of Florida's long-arm statute "is a question of Florida law," therefore the Court is required to apply the statute "as would the Florida Supreme Court."   *United Techs.*, 556 F.3d at 1274.   "Florida's long-arm statute is to be strictly construed."   *Sculptchair*, 94 F.3d at 627.

The Florida long-arm statute provides, in relevant part, as follows:

A person, whether or not a citizen or resident of this state, who personally or through an agent does any of the acts enumerated in this subsection thereby submits

---

[2] Although the Defendant also argues in its Motion to Dismiss that the Court lacks general jurisdiction over the Defendant, (Doc. 12 at 10), the Plaintiff does not address this contention in its opposition brief nor submit any evidence to support a finding of general jurisdiction.   (*See* Doc. 27).   It therefore appears that the Plaintiff has conceded that general jurisdiction does not exist, and this issue will not be further discussed.   *See United Techs.*, 556 F.3d at 1274 (the plaintiff bears the initial burden of alleging sufficient facts in the complaint to establish a *prima facie* case of personal jurisdiction).   Moreover, a review of the Complaint demonstrates an absence of any allegations that would establish a *prima facie* case of general personal jurisdiction.   (*See* Doc. 1).

[3] The Plaintiff also argues in its response that the Court has specific jurisdiction over the Defendant pursuant to Florida Statute § 48.193(1)(a)(1), which extends long-arm jurisdiction over those who operate, conduct, engage in, or carry on a business or business venture in Florida or have an office or agency in Florida.   (Doc. 27 at 8-9).   The Defendant did not address this argument in its Motion to Dismiss, most likely because there is nothing in the Complaint alleging a *prima facie* case of personal jurisdiction on this basis.   (*See* Doc. 1).   The undersigned need not address this argument any further however because, as discussed later in this Report, the undersigned finds that the Court has specific jurisdiction over the Defendant pursuant to § 48.193(1)(a)(2).

> himself or herself and, if he or she is a natural person, his or her personal
> representative to the jurisdiction of the courts of this state for any cause of action
> arising from any of the following acts:
>
> . . .
>
> Committing a tortious act within this state.

Fla. Stat. § 48.193(1)(a)(2).   The Eleventh Circuit has adopted a "broad interpretation" of this

provision, concluding that a nonresident defendant commits a tortious act within Florida "when he

commits an act *outside* the state that causes *injury within Florida*."   *Louis Vuitton Malletier, S.A.*,

736 F.3d at 1353 (emphasis in original) (citing *Licciardello v. Lovelady*, 544 F.3d 1280, 1283 (11th

Cir. 2008)).

A claim of trademark infringement constitutes a "tortious act" for purposes of §

48.193(1)(a)(2).   *Id.*   The issue here is whether a nonresident defendant's allegedly infringing use

of a trademark on the internet is enough to establish specific jurisdiction.[4]   The Eleventh Circuit

confronted this very issue in *Licciardello v. Lovelady*, 544 F.3d 1280 (11th Cir. 2008) and *Louis*

*Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339 (11th Cir. 2013) and held in the affirmative.

In *Licciardello*, the plaintiff (Licciardello) was a nationally-known entertainer and Florida

resident who sued his former personal manager and Tennessee resident (Lovelady), for trademark

infringement in the Middle District of Florida.   *Id.* at 1282-83.   Licciardello alleged that Lovelady

---

[4] The Plaintiff also argues in its opposition brief that specific jurisdiction exists under the alternative basis that the Defendant sells infringing products in Florida through a network of resellers who have 335 locations throughout the state.  (Doc. 27 at 7).  The Complaint, however, contains no allegations to support this contention.  (*See* Doc. 1 at ¶¶ 26-54).  The evidence the Plaintiff cites is also unpersuasive.  (*See* Docs. 12-1 at ¶¶ 7-8; 28-2; 28-5; 28-6; 28-7; 28-8; 28-9; 28-10; 28-11; 28-12; 28-13; 28-14).   These materials merely show that the Defendant's products are sold in Florida via a network of resellers, but there is nothing in any of these documents that even suggests that any of these products used or infringed upon the Marks (in fact the vast majority of the cited exhibits don't even identify which products of the Defendants are being sold by these resellers).  (*See, e.g.*, Docs. 12-1 at ¶ 8; Docs. 28-1; 28-2; 28-5 through 28-14).

wrongfully used Licciardello's trademarked name and picture on Lovelady's website, which was accessible to the public in Florida and promoted Lovelady as a personal manager for music artists. *Id*. at 1282.   The website was created by one of Lovelady's employees in Tennessee.  *Id*. at 1283. Licciardello argued that Lovelady's creation of the website in Tennessee containing an allegedly infringing and deceptive use of Licciardello's trademarks constituted a tortious act within Florida pursuant to § 48.193(1)(a)(2).[5]  *Id*.  Lovelady moved to dismiss for lack of personal jurisdiction on the basis that he did not commit any tort because he did not actually create the website.  *Id*.  The district court granted the motion to dismiss.  *Id*. at 1282-83.

On appeal, the Eleventh Circuit reversed and held that personal jurisdiction existed under § 48.193(1)(a)(2), because "although the website was created in Tennessee, the Florida long-arm statute is satisfied if the alleged trademark infringement on the website caused injury in Florida." *Id*. at 1283.   The Court of Appeals ignored (and implicitly rejected) Lovelady's argument that he could not be held liable because he did not directly create the website.   The Court went on to reason that it "need not decide whether trademark injury necessarily occurs where the owner of the mark resides, as the Florida district courts have held, because in this case the alleged infringement clearly also occurred in Florida by virtue of the website's accessibility in Florida."  *Id*.   Thus, as the Eleventh Circuit clarified in a later decision, *Licciardello* "instructs that, under the 'tortious acts' provision in § 48.193(1)(a)(2), a trademark infringement on an Internet website causes injury and occurs in Florida 'by virtue of the website's accessibility in Florida.'"  *Louis Vuitton Malletier, S.A.*, 736 F.3d at 1353-54 (citing *Licciardello*, 544 F.3d at 1283).

The Eleventh Circuit followed *Licciardello* in its later decision *Louis Vuitton Malletier*, in

---

[5] At the time *Licciardello* was decided, the tortious act provision of the Florida long-arm statute was codified at Fla. Stat. § 48.193(1)(b).   That provision is identical to the current version set forth in § 48.193(1)(a)(2).

which the defendant created websites that marketed and sold counterfeit and infringing Louis Vuitton merchandise.  *Id*. at 1354.   The court found the location where the websites were created was immaterial in determining whether § 48.193(1)(a)(2) applies.   *Id*.   Instead, the court stated that the relevant inquiry is whether the defendant's tortious acts caused injury in Florida.  *Id*.   Because the websites were accessible in Florida, they caused injury in Florida, and, consequently, satisfied the requirements of § 48.193(1)(a)(2).   *Id*.[6]

The binding precedent of *Licciardello* and *Louis Vuitton Malletier* support a finding of specific personal jurisdiction in this case.   The facts herein are analogous to those of *Licciardello*. Here, the Plaintiff, a Florida corporation, alleges that the Defendant, a citizen of Ohio, impermissibly used the Plaintiff's Marks in a series of online marketing campaigns to promote the Defendant's own products.   (Doc. 1 at ¶¶ 2-3, 27-31, 35, 37, 41, 44, 47-49).   The Plaintiff alleges that it was aware of each infringing advertisement and routinely demanded that the Defendant remove the advertisements.   (*Id*. at ¶¶ 29, 33, 35-37, 41-42, 44-45, 48).   Considering the Plaintiff is headquartered in Florida, it is reasonable to infer that the Plaintiff viewed the infringing advertisements in Florida and was injured in Florida.   (*Id.* at ¶¶ 50-53).   Thus, similar to the situation in *Licciardello*, the undersigned finds that the allegations in the Complaint establish a *prima facie* case of specific personal jurisdiction under § 48.193(1)(a)(2).   *See, e.g.*, *Evans v. Andy & Evans Indus., Inc.*, Case No. 15-cv-61013-WPD, 2016 WL 8787062, at *3 (S.D. Fla. July 15, 2016) ("The Court agrees with Plaintiffs that the accessibility in Florida of A&E's website featuring infringing garments constitutes a tortious act causing injury in Florida.").

The Defendant ignores this binding precedent and instead argues that specific personal

---

[6] In addition to the websites, the defendant also sold infringing materials to Florida customers through the websites.  *Louis Vuitton Malletier, S.A.*, 736 F.3d at 1354.   The court cited this as another independent fact that satisfied the requirements of § 48.193(1)(a)(2).  *Id*.

jurisdiction does not exist under § 48.193(1)(a)(2) because (a) it was Amazon, not the Defendant, who displayed the online advertisements on Amazon's own national website, and therefore the Defendant never engaged in any infringing conduct; and (b) the online communication from the Defendant's own website was a single private communication, and there are no allegations or evidence that the communication was directed to anyone in Florida.   (Doc. 12 at 9).[7]

The Defendant relies on the affidavit of Jonathan Nook, its owner and president, as support for its first argument.   (*Id.* at 8-9).   Mr. Nook avers that the Defendant sells its products on its own website, which operates from Ohio, as well as on online platforms such as Amazon.   (Doc. 12-1 at ¶ 7).   Although the Defendant engages in national advertising campaigns directed at the purchasing public as a whole, the Defendant has never directly targeted any advertisements into Florida or at any Florida persons or businesses.   (*Id.* at ¶ 9).   With respect to Amazon, Mr. Nook avers that the Defendant contracts with Amazon to display the Defendant's advertisements, but only when certain keywords are entered into Amazon's website.   (*Id.* at ¶ 10).   Accordingly, the Defendant argues that because Amazon controls its website, it is the only entity that controls when the Defendant's advertisements appear online; and in turn, Amazon is the only entity directing any communications into Florida.   (Doc. 12 at 9).

---

[7] The only decisional authority the Defendant cites with respect to the application of § 48.193(1)(a)(2) consists of a 2008 unpublished decision from the Southern District of Florida, and a 2002 Florida Supreme Court decision.   (*See* Doc. 12 at 8-9) (citing *Jackson v. Grupo Indus. Hotelero, S.A.*, No. 07-22046-CIV, 2008 WL 4648999 (S.D. Fla. Oct. 20, 2008) and *Wendt v. Horowitz*, 822 So. 2d 1252 (Fla. 2002)).   The Defendant has not explained how either of these decisions trump *Licciardello* or *Louis Vuitton Malletier*, which the undersigned has already noted constitute binding precedent.   Moreover, the Florida Supreme Court decision in *Wendt* merely stands for the proposition that "telephonic, electronic, or written communications into Florida may form the basis for personal jurisdiction [under the prior version of § 48.193(1)(a)(2)] if the alleged cause of action arises from the communication."   822 So. 2d at 1260.   The Florida Supreme Court expressly declined to determine whether personal jurisdiction had been established by the facts of that case.

This argument fails for several reasons.  First, it flies in the face of *Licciardello*, which implicitly rejected this same argument (that the defendant did not commit any tort because he did not expressly create the website), and instead found personal jurisdiction to exist under Florida's long-arm statute because the website was accessible in Florida.  544 F.3d at 1283-84.  Thus, even if the Defendant had zero control over when and how its advertisements showed up on Amazon's website, this fact would not be dispositive because Amazon's website is clearly accessible in Florida.  *See Louis Vuitton Malletier*, 736 F.3d at 1353-54.

Second, and perhaps more importantly, the facts of this case (as established by the allegations of the Complaint and the evidence submitted) are even stronger than those presented in *Licciardello*.  First, it is undisputed that the Defendant created its own advertisements, and as Mr. Nook states in his affidavit, the Defendant provides its advertisements to Amazon for publication on its website.  (Doc. 12-1 at ¶ 9).  And, as alleged in the Complaint, the advertisements created by the Defendant clearly contain the words "tender" and "battery tender."  (Doc. 1 at ¶¶ 31, 35, 37, 41, 44).  It also bears reiterating that the Plaintiff sent demand letters to the Defendant after identifying each of these Amazon advertisements, and in response, the advertisements were taken down.  Since there are no allegations or evidence that the Plaintiff ever sent such letters to Amazon directly, it can be reasonably inferred that the Defendant had control over whether these advertisements continued to be publicized online.   Moreover, while Mr. Nook's affidavit states that Amazon displays advertisements when "certain keywords are entered in Amazon's website," Mr. Nook is notably silent as to how such keywords are created.  (Doc. 12-1 at ¶ 9).  However, the Defendant's petition for cancellation, which is attached to the Motion to Dismiss, clearly states that as a competitor of the Plaintiff, the Defendant "will at times use the words 'battery tender' or 'tender' in its marketing materials, *in Amazon keywords*, keywords for targeted paid advertisements and for

product comparisons."   (Doc. 12-3 at 5, ¶ 6) (emphasis added).

Thus, contrary to the Defendant's position, the Defendant has not relinquished all control to Amazon.   Rather, by creating the "battery tender" and "tender" keywords, it is the Defendant, not Amazon, who controls when the online advertisements (which the Defendant also created and provided to Amazon) appear on Amazon's website and, in turn when these online advertisements are communicated into Florida.   Unlike the defendant in *Licciardello*, who argued he played absolutely no role in his website, the Defendant clearly controlled the content and the manner in which its allegedly infringing advertisements could be communicated to persons in Florida.   The fact that Amazon played some role in this does not obviate the application of § 48.193(1)(a)(2) under the circumstances in this case.   *Licciardello*, 544 F.3d at 1283.   *See also Xymogen, Inc. v. Digitalev, LLC*, Case No. 6:17-cv-869-Orl-31KRS, 2018 WL 659723 at *1-2 (M.D. Fla. Feb. 1, 2018) (finding § 49.193(1)(a)(2) was satisfied where defendant purchased Google ads and submitted keywords which included the plaintiff's trademarked name "Xymogen," so that when Google users searched for "Xymogen" a sponsored link would appear directing them to the defendant's website).[8]

In sum, the Defendant has failed to present any evidence or persuasive argument contradicting the Plaintiff's allegations supporting the application of § 48.193(1)(a)(2).   Therefore, the undersigned finds that specific personal jurisdiction is proper under § 48.193(1)(a)(2).

## 2.  Due Process

The Defendant alternatively contends that it does not possess sufficient minimum contacts

---

[8] The Defendant's second argument – that a single reference to "battery tender" on its own website in response to an inquiry from an unknown customer is insufficient to convey personal jurisdiction – is equally unavailing.   The undersigned has already determined that personal jurisdiction exists by virtue of the Defendant's online Amazon advertisements.   The Defendant's statement on its own website – a website that is accessible to persons in Florida – only supports this determination.

with Florida, and therefore exercising personal jurisdiction over it would offend traditional notions of fair play and substantial justice in violation of the Fourteenth Amendment's Due Process Clause. (Doc. 12 at 10-12).

The Court applies a three-part test in determining whether exercising specific jurisdiction over a nonresident defendant comports with due process: "(1) whether the plaintiff's claims arise out of or relate to at least one of the defendant's contacts with the forum; (2) whether the nonresident defendant purposefully availed himself of the privilege of conducting activities within the forum state, thus invoking the benefit of the forum state's laws; and (3) whether the exercise of personal jurisdiction comports with traditional notions of fair play and substantial justice." *Louis Vuitton Malletier*, 736 F.3d at 1355 (internal citations and quotation marks omitted).   "The plaintiff bears the burden of establishing the first two prongs, and if the plaintiff does so, a defendant must make a compelling case that the exercise of jurisdiction would violate traditional notions of fair play and substantial justice."   *Id*. (internal citations and quotation marks omitted).

### a.  Relatedness.

The Plaintiff has satisfied the first part of the due process test – that its claims "arise out of or relate to" at least one of the Defendant's contacts with Florida.   The Plaintiff alleges that: (1) the infringing advertisements were accessible in Florida (*See* Doc. 1 at ¶¶ 29, 33, 36, 42, 45); (2) the Plaintiff – a Florida corporation – was aware of the advertisements and repeatedly demanded the Defendant to cease its infringing activity (*Id*. at ¶¶ 33, 36); and (3) the Defendant would remove the advertisements after receipt of a demand letter, only to replace them with slightly modified, but still infringing, advertisements (*Id*. at ¶¶ 35, 37-41, 44, 48).   It is therefore reasonable to infer from these allegations that the Defendant was aware that its actions were affecting the Plaintiff and that any harm caused by its actions would affect the Plaintiff in its home state, Florida.   *See Oldfield v.*

*Pueblo De Bahia Lora, S.A.*, 558 F.3d 1210, 1222-23 (11th Cir. 2009) ("Necessarily, the contact must be a 'but-for' cause of the tort, yet the causal nexus between the tortious conduct and the purposeful contact must be such that the out-of-state resident will have fair warning that a particular activity will subject it to the jurisdiction of a foreign sovereign.") (internal quotation marks omitted) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)); *Roof & Rack Prods., Inc. v. GYB Inv'rs, LLC*, No. 13-80575-CV, 2014 WL 3116413, at *3 (S.D. Fla. July 8, 2014) ("[W]hen a plaintiff claims a defendant infringes its trademark by posting the infringing marks on the defendant's website, and the defendant's contacts with the forum state are that its website is accessible there, the plaintiff's claims arise out of or relate to the defendant's contacts with the forum state.") (citing *Licciardello*, 544 F.3d at 1285 n.4). *See also Dohler, S.A. v. Gift Guru*, No. 16-23137-CIV-GAYLES, 2017 WL 4621098 (S.D. Fla. Oct. 16, 2017) (holding that the "relatedness" prong was satisfied where defendant used Amazon to sell and distribute counterfeit products in Florida).

### b. Purposeful Availment

The Plaintiff has also met its burden with respect to the second prong.   In intentional tort cases, including claims for trademark infringement, a court may apply one of two tests to determine whether the nonresident defendant has purposefully availed itself of the forum state – the "effects test" articulated in *Calder v. Jones*, 465 U.S. 783 (1984), or the traditional minimum contacts test articulated in *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770 (1984).   *Louis Vuitton Malletier*, 736 F.3d at 1356.   The Eleventh Circuit has used both tests in intentional tort cases, however, a plaintiff need only satisfy one in order to establish "purposeful availment."   *Compare Licciardello*, 544 F.3d at 1287-88 (using the "effects test" to establish personal jurisdiction) *with Louis Vuitton Malletier*, 736 F.3d at 1357-58 (applying the "minimum contacts test" to establish personal jurisdiction).

"Under the effects test, a nonresident defendant's single tortious act can establish purposeful availment, without regard to whether the defendant had any other contacts with the forum state. This occurs when the tort: (1) was intentional; (2) was aimed at the forum state; and (3) caused harm that the defendant should have anticipated would be suffered in the forum state." *Louis Vuitton Malletier*, 736 F.3d at 1356 (internal quotation marks and citations omitted) (citing *Licciardello*, 544 F.3d at 1285-88). "The 'effects test' provides an additional means, unavailable in contract cases, of determining the appropriateness of personal jurisdiction – one that is based on a plaintiff's ties to the forum state and the harm suffered by the plaintiff." *Id.* at 1357.

In applying the effects test in *Licciardello*, the Eleventh Circuit explained:

> Lovelady is alleged to have committed an intentional tort against [Licciardello] — using his trademarked name and his picture on a website accessible in Florida in a manner to imply [Licciardello's] endorsement of Lovelady and his products. The use was not negligent, but intentional. The purpose was to make money from [Licciardello's] implied endorsement. The unauthorized use of [Licciardello's] mark, therefore, individually targeted [Licciardello] in order to misappropriate his name and reputation for commercial gain. These allegations satisfy the *Calder* effects test for personal jurisdiction—the commission of an intentional tort, expressly aimed at a specific individual in the forum whose effects were suffered in the forum. The Constitution is not offended by the exercise of Florida's long-arm statute to effect personal jurisdiction over Lovelady because his intentional conduct in his state of residence was calculated to cause injury to [Licciardello] in Florida. Lovelady cannot now claim surprise at being haled into court here.

*Licciardello*, 544 F.3d at 1287-88 (internal citations omitted). Based on these facts, the court further held "that where the internet is used as a vehicle for the deliberate, intentional misappropriation of a specific individual's trademarked name or likeness and that use is aimed at the victim's state of residence, the victim may hale the infringer into that state to obtain redress for the injury." *Id.* at 1288 n.8.

Again, the situation in this case is similar to *Licciardello*. The Defendant here is alleged to have intentionally used the Marks in various online marketing campaigns, that were accessible

in Florida, in an effort trade on the goodwill and reputation of the Marks for its own commercial

gain. (Doc. 1 at ¶¶ 29-37, 50-51). The Defendant continued its infringing marketing campaigns

despite repeated demands from the Plaintiff to cease and desist. (*Id*. at ¶¶ 33-48). These

allegations satisfy the effects test because they establish that the Defendant committed intentional

torts that were aimed at the Plaintiff in Florida and caused harm that the Defendant should have

anticipated would be suffered by the Plaintiff in Florida. Therefore, the undersigned finds that the

Plaintiff has established that the Defendant purposely availed itself of Florida such that it "cannot

now claim surprise at being haled into court here." *Licciardello*, 544 F.3d at 1288.[9] *See also*

*Xymogen*, 2018 WL 659723 at * 3 (applying "effects test" to establish "purposeful availment" prong

in a trademark infringement case involving online Google ads); *Dedvukaj v. Maloney*, 447 F. Supp.

2d 813, 820 (E.D. Mich. 2006) ("Sellers cannot expect to avail themselves of the benefits of the

internet-created world market that they purposefully exploit and profit from without accepting the

concomitant legal responsibilities that such an expanded market may bring with it.").

### c. Traditional Notions of Fair Play and Substantial Justice

Having satisfied the first two prongs, the burden now shifts to the Defendant to present a

"compelling case" that exercising jurisdiction over it would violate traditional notions of fair play

and substantial justice. *Louis Vuitton Malletier*, 736 F.3d at 1355 (internal citations and quotation

marks omitted). In making this analysis, the Court considers: 1) the burden on the defendant; 2)

the forum state's interest in adjudicating the dispute; 3) the plaintiff's interest in obtaining

convenient and effective relief; 4) the interstate judicial system's interest in obtaining the most

---

[9] The Defendant appears to ignore the *Calder* "effects test" and instead argues that the "purposeful availment" prong cannot be met because the Defendant did not have sufficient minimum contacts with Florida. (Doc. 12 at 10-12). The undersigned will not address this argument as it has already found that the "effects test" has been satisfied.

efficient resolution of controversies; and 5) the shared interest of the several states in furthering fundamental substantive social policies.  *Future Tech. Today, Inc. v. OSF Healthcare Sys.*, 218 F.3d 1247, 1251 (11th Cir. 2000) (citing *Burger King*, 471 U.S. at 466).  *See also Licciarello*, 544 F.3d at 1288.

The Defendant has not offered any evidence with respect to any of these elements, nor made any argument beyond a conclusory statement that subjecting it to personal jurisdiction in Florida "violates Due Process and offends traditional notions of fair play and substantial justice," and noting that it "is an Ohio corporation with no employees or offices in Florida."  (Doc. 12 at 10, 12).  On this basis alone, the undersigned finds that the Defendant has failed to present a "compelling case." Moreover, the evidence before the Court and the unrebutted allegations of the Complaint show that traditional notions of fair play and substantial justice will not be violated in this case.

The Defendant appears to be a well-sized corporation that sells its products nationwide through its website and multiple resellers, and it has not presented any evidence showing that it would be unreasonably burdensome for it to litigate in Florida.  *Cf. Evans v. Wurkin Stiffs, Inc.*, Case No. 15-61934-CIV-COHEN/SELTZER, 2016 WL 8793339, at *4 (S.D. Fla. Mar. 21, 2016) (finding the first fair-play factor weighed against exercising jurisdiction over nonresident defendant because it was a "small Wisconsin store with a sole owner and operator").  The fact that it is an Ohio corporation and that its employees are ostensibly in Ohio also does not establish any unreasonable burden – modern transportation and technology can ameliorate any travel concerns. *See Thursday LLC v. Klhip Inc.*, Case No. 8:17-cv-1587-T-36AEP, 2018 WL 4216389 at * 7 (M.D. Fla. Sept. 5, 2018) (citation omitted).  And any burden to the Defendant would be offset by the burden to the Plaintiff should it be required to litigate in Ohio.  *Licciardello*, 544 F.3d at 1288 (a "Florida plaintiff, injured by the intentional misconduct of a nonresident expressly aimed at the

Florida plaintiff, is not required to travel to the nonresident's state of residence to obtain a remedy.") (citing *Calder*, 465 U.S. at 790).

Further, the Plaintiff and Florida both have a strong interest in litigating this dispute because it is where the Plaintiff is headquartered and where the Plaintiff, a citizen of Florida, was harmed by the Defendant's conduct.  *See Licciardello*, 544 F.3d at 1288 (finding the plaintiff has a strong interest in litigating in the forum where the intentional misconduct was directed and the state has a strong interest in affording its residents a forum to obtain relief from intentional misconduct of nonresidents causing harm in Florida).  Finally, there is nothing in the record to suggest that proceeding in Florida would be less efficient than if the case was to proceed in Ohio, and this Court has an interest in resolving disputes involving consumers in Florida.

In summary, the undersigned finds that the Court may exercise personal jurisdiction over the Defendant and respectfully recommends that the Defendant's request to dismiss for lack of personal jurisdiction be denied.

### B.  Stay Pending TTAB Decision[10]

Less than one month before the Plaintiff filed this case, the Defendant filed a petition with the TTAB to cancel the registration for the BATTERY TENDER mark.   (Doc. 12-3 at 2-3).   The Defendant claims that cancellation is appropriate because that Mark has become a generic term for a type of battery charger.   (*Id*. at 2-3, 7).   The petition does not address the DELTRAN BATTERY TENDER mark.   The Defendant now argues that the Court should exercise its discretion to stay the

---

[10] The Plaintiff argues that this portion of the Motion to Dismiss should be denied because the Defendant did not comply with the conferral requirement of Local Rule 3.01(g) as to the stay request.   (Doc. 27 at 20).   Because all arguments contained in the Motion to Dismiss have been fully briefed, the undersigned will not further consider this contention.   However, the parties are both warned that failure to comply with the Local Rules of this Court, including Rule 3.01(g), may result in the summary denial of motions in the future.

case pending a decision by the TTAB by either exercising its inherent power to promote judicial efficiency, or by invoking the "primary jurisdiction doctrine," which "comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views." *Smith v. GTE Corp.*, 236 F.3d 1292, 1298 n. 3 (11th Cir. 2001) (quoting *United States v. Western Pac. R.R. Co.*, 352 U.S. 59, 64 (1956)).

With respect to the judicial efficiency argument, the Defendant argues that this case is in its infancy (filed less than one month after the TTAB petition), and that resolving the TTAB petition will simplify the issues in this matter – more specifically, if the TTAB were to find that the BATTERY TENDER mark is generic, it would be dispositive of each of the Plaintiff's claims. (Doc. 12 at 14).   The Defendant further argues that due to the early stage of this case, the Plaintiff will not suffer any harm or prejudice by a stay.

In response, the Plaintiff argues that the TTAB's determination will not be a final decision on the validity of the BATTERY TENDER mark because the decision can be appealed and relitigated in this Court.   (Doc. 27 at 17-18).   *See* 15 U.S.C. § 1071(b)(1).   The Plaintiff also notes that the petition pending before the TTAB only seeks to cancel one of the Plaintiff's four registered trademarks at issue in this case (the BATTERY TENDER mark with Registration No. 4750963), and therefore resolution of the TTAB petition will not be dispositive of the Plaintiff's remaining claims.   (Doc. 27 at 17-18).   For example, litigation in this Court must still go forward on the DELTRAN BATTERY TENDER mark regardless of the TTAB's ruling.   (*Compare* Doc. 1 *with* Doc. 12-3 at 2-3).   Therefore, the Plaintiff argues that the interests of judicial efficiency will not be

served by a stay, the claims and issues in this case will not be streamlined, and the Plaintiff will suffer prejudice by being forced to wait years before having its day in court.[11]

The undersigned finds that the Plaintiff has the better of this argument.   It is clear that the TTAB proceedings will not be dispositive of all of the claims before this Court.   Moreover, the Defendant has not presented any compelling reasons for staying this case for what could be years. The fact that this case is in its infancy applies with equal force to the TTAB proceeding – both were filed within a month of each other and both are in their early stages – in other words this is not a situation where extensive discovery has already taken place in the administrative proceeding such that it would be an unnecessary and wasteful duplication of efforts to engage in discovery here.   *Cf. Tigercat Intern., Inc. v. Caterpillar, Inc.*, No. 16-cv-1047-GMS, 2018 WL 2049816, at *6 (D. Del. May 2, 2018) (staying trademark infringement lawsuit pending resolution of a related TTAB proceeding on the basis of judicial efficiency where the district court action was filed three years *after* commencement of the TTAB proceeding and only two months before the TTAB trial was scheduled to begin, and where the parties had engaged in extensive discovery and opposition proceedings before the TTAB).   Simply put, the undersigned does not find that the interests of judicial efficiency would be served by staying the case.   *See BP Intern. Rights Holdings, Inc. v. Boston Gourmet Coffeehouse, Inc.*, Case No. 6:07-cv-1783-Orl-22KRS, 2008 WL 11436772, at * 2 (M.D. Fla. Jan. 2, 2008) (noting that a TTAB determination that a trademark should be canceled would not dispose of all trademark infringement issues).

---

[11] A recent filing in the TTAB proceeding reveals that the merit briefs are due in late 2020. *The NOCO Co. v. Deltona Transformer Corp.*, Cancellation No. 92070474, Doc. 14 (T.T.A.B. July 11, 2019).   Therefore, it will be at least a year or more before a decision is handed down by the TTAB.

The undersigned also does not agree that the primary jurisdiction doctrine supports a stay of this case.   The Eleventh Circuit has not addressed the applicability of this doctrine in a trademark infringement action.   However, several other Courts of Appeal have, as well as at least one District Court in this Circuit, each of which have held that the doctrine should not apply to stay a trademark infringement lawsuit.   In *Goya Foods, Inc. v. Tropicana Products, Inc.*, 846 F.2d 848 (2d Cir. 1988), the Second Circuit noted that: 1) unlike other administrative agency proceedings, an appeal of an adverse TTAB determination under 15 U.S.C. § 1071(b) is actually "an independent judicial proceeding" which "is virtually de novo;" 2) the record created in the TTAB proceeding, while admissible in a subsequent district court proceeding, has no binding effect on the district court; and 3) the TTAB's expertise about registration issues would likely not be as helpful to a district court compared to other agency rulings because district courts regularly adjudicate trademark disputes. *Id*. at 852-53 (citations omitted).   The *Goya* court further explained:

> If a district court action involves only the issue of whether a mark is entitled to registration and if subject matter jurisdiction is available, the doctrine of primary jurisdiction might well be applicable, despite the differences between the trademark registration scheme and other regulatory patterns.   In such a case, the benefits of awaiting the decision of the PTO would rarely, if ever, be outweighed by the litigants' need for a prompt adjudication.   But where, as in the pending case, a district court suit concerns infringement, the interest in prompt adjudication far outweighs the value of having the views of the PTO.   Whether a litigant is seeking to halt an alleged infringement or, as in this case, seeking a declaration of non-infringement, it is entitled to have the infringement issue resolved promptly so that it may conduct its business affairs in accordance with the court's determination of its rights.   Delaying consideration of Goya's claim pending the outcome of the TTAB proceedings undercuts the purpose of declaratory relief by forcing Goya either to abandon use of trademarks it has used for more than a decade or to "persist in piling up potential damages."

*Id*. at 853-54 (internal citations omitted).

The First Circuit similarly rejected the application of the primary jurisdiction doctrine in trademark infringement actions because the TTAB

is not an ordinary administrative agency whose findings control unless set aside after court review under a highly deferential standard. [*Cf. Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843–45, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).] Under the Lanham Act, where a contested Board proceeding has already addressed the validity of the mark, the Board's findings can be challenged in a civil action in district court through new evidence, and, at least to a large extent, the issues can be litigated afresh. 15 U.S.C. § 1071(b). And Congress permits an initial proceeding in the district court to challenge or affirm a federally registered mark in civil suits in which a federally registered mark is in issue, even without any prior resort to the Board. 15 U.S.C. § 1119.

Second, at least where an infringement claim is involved—whether directly asserted by an "owner" or challenged in a declaratory action—there is often some urgency. Ongoing business conduct is likely to be involved and harm, possibly irreparable, may be accruing. Further, [unlike a federal district court,] the Board cannot give relief for an infringement claim, either injunctive or by way of damages. [See 15 U.S.C. §§ 1063(a), 1064, 1067(a). Cf. 15 U.S.C. §§ 1114–1119 (powers of the district court are much broader).] Under these circumstances awaiting the Board's action is less attractive; and this is doubly so because (as already noted) its administrative findings can so easily be relitigated in court.

*PHC v. Pioneer Healthcare, Inc.*, 75 F.3d 75, 80 (1st Cir. 1996).   *See also Rhoades v. Avon Prods., Inc.*, 504 F.3d 1151, 1164 (9th Cir. 2007) (following both *Goya* and *PHC* and declining to apply the primary jurisdiction doctrine because the TTAB is not the "exclusive expert in the field," and because where there is a potential infringement lawsuit, "federal courts are particularly well-suited to handle the claims so that parties may quickly obtain a determination of their rights without accruing potential damages.").

United States District Judge Anne C. Conway also followed *Goya* in declining to apply the primary jurisdiction doctrine to a trademark infringement case where cancellation proceedings were also pending before the TTAB.   *BP Intern.*, 2008 WL 11436772, at *1.   As Judge Conway stated: "[d]etermination of the propriety of registration and whether or not infringement has occurred will depend on dates of use, timing of acquisition of rights, strength of marks, and other factors germane to a likelihood of confusion.   None of these issues requires the Court's deference to the TTAB's administrative expertise."   *Id.*   *See also W & G Tenn. Imps., Inc. v. Esselte Pendaflex Corp.*, 769

F. Supp. 264, 265 (M.D. Tenn. 1991) (primary jurisdiction doctrine "is not normally applied in cases where questions of trademark validity and trademark infringement are involved.").

The undersigned agrees with the First, Second, and Ninth Circuits, and with Judge Conway's decision and finds that this case should not be stayed pursuant to the primary jurisdiction doctrine. As discussed in detail above, any decision by the TTAB will not be dispositive of the claims in this case both because it is subject to de novo review and the submission of additional evidence, and because it will only involve one of the Plaintiff's four marks.   *See E. & J. Gallo Winery v. F. & P. S.p.A.*, 899 F. Supp. 465, 468 (E.D. Cal. 1994) (finding the fact that the case involved trademarks that were not related to the ongoing TTAB proceeding weighed against staying the case pending the TTAB's cancellation determination).   Moreover, the federal court is well equipped to resolve trademark infringement actions, thus this is not a situation where the administrative agency's expertise will be uniquely helpful.   Accordingly, the undersigned finds that the Plaintiff's interest in having a prompt adjudication of its infringement claims outweighs the benefit of having the TTAB's determination on cancellation, and the undersigned respectfully recommends that this case should not be stayed pursuant to the primary jurisdiction doctrine.[12]

---

[12]  The Defendant cites to four district court decisions in support of its primary jurisdiction argument.   None of these decisions are persuasive.   *Microchip Technology, Inc. v. Motorola, Inc.*, No. Civ.A. 01-264-JJF, 2002 WL 32332753, at *1, 3 (D. Del. May 28, 2002), involved a scenario where the plaintiff filed a trademark infringement claim over a single mark, and the TTAB proceeding involved that same mark.   The district court stayed the case because the TTAB's determination would be dispositive of all of the plaintiff's claims.   *McKenzie v. Progressive Auto Pro Ins. Co.*, Case No. 2:06-cv-238-FtM-99DNF, 2007 WL 1079201 (M.D. Fla. Apr. 9, 2007) involved a claim that an insurance company charged interest and service charges in violation of Florida law.   The district court discussed the primary jurisdiction doctrine, but did not hold that it applied; rather the court held that under Florida law the plaintiffs first were required to exhaust their state administrative remedies before filing suit.   *Id.* at *2-3.   *Patent Asset Licensing, LLC v. Bright House Networks, LLC*, Case Nos. 3:15-cv-742-J-32MCR, 3:15-cv-743-J-32MCR, 3:15-cv-744-J-32MCR, 3:15-cv-746-J-32MCR, 3:15-cv-747-J-32MCR, 2016 WL 4431574 (M.D. Fla. Aug. 22, 2016) involved a patent dispute before the Patent Trial and Appeal Board, which has different appeal and review provisions, and does not discuss the primary jurisdiction doctrine at all.   Similarly, the

## C.   Venue

The Defendant's final argument is that this case should be transferred to the Northern District of Ohio pursuant to 28 U.S.C. § 1404(a) because the relevant witnesses and evidence are located in Ohio and therefore Ohio is the more convenient forum.   (Doc. 12 at 15-16).   The Plaintiff argues in response that the Defendant has not presented any compelling reasons to transfer this case from the Plaintiff's chosen forum to Ohio.   (Doc. 27 at 15-16).

"For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district . . . where it might have been brought[.]"   28 U.S.C. § 1404(a).   Once a court determines that an action could have been brought in the transferee forum,[13] the court considers the following private and public factors in deciding whether transfer is justified: 1) the convenience of the witnesses; 2) the location of relevant documents and the relative ease of access to sources of proof; 3) the convenience of the parties; 4) the locus of operative facts; 5) the availability of process to compel the attendance of unwilling witnesses; 6) the relative means of the parties; 7) a forum's familiarity with the governing law; 8) the weight accorded a plaintiff's choice of forum; and 9) trial efficiency and the interests of justice, based on the totality of the circumstances.   *Manuel v. Convergys Corp.*, 430 F.3d 1132, 1135 n.1 (11th Cir. 2005).   District courts have broad discretion in deciding whether to transfer an action to a more convenient forum. *See England v. ITT Thompson Industries, Inc.*, 856 F.2d 1518, 1520 (11th Cir. 1988).   Moreover,

---

district court in *Tigercat*, 2018 WL 2049816 expressly refused to rely upon the primary jurisdiction argument but rather focused on the issue of judicial efficiency, and also involved a situation where the parties engaged in extensive discovery and opposition proceedings before the TTAB for over three years before an infringement lawsuits was filed.   *Id*. at *1, 4.

[13]   There is no dispute that this case could have been brought in Ohio since the Defendant is incorporated and has its principal place of business in Ohio.   *See* 28 U.S.C. § 1391(b)(1).

"the burden is on the movant to establish that the suggested forum is more convenient."   *In re Ricoh Corp.*, 870 F.2d 570, 573 (11th Cir. 1989).

### 1.   The Convenience of the Witnesses

Convenience of the witnesses is "one of the most important factors" for determining the best venue for a trial.   *Response Rewards Sys., L.C. v. Meijer, Inc.*, 189 F. Supp. 2d 1332, 1340 (M.D. Fla. 2002).   *See also Trinity Christian Ctr. of Santa Ana, Inc. v. New Frontier Media, Inc.*, 761 F. Supp. 2d 1322, 1327 (M.D. Fla. 2010).   The importance of this factor, however, is "diminished when the witnesses, although in another district, are employees of a party and their presence at trial can be obtained by that party."   *Trinity Christian Ctr.*, 761 F. Supp. 2d at 1327 (citing *Mason v. Smithkline Beecham Clinical Labs.*, 146 F. Supp. 2d 1355, 1361-62 (S.D. Fla. 2001)).

Neither side has submitted a list of proposed witnesses.   *See Oller v. Ford Motor Co.*, Nos. 92-523-CIV-T-17A, 92-555-CIV-T-15C, 1994 WL 143017, at *3 (M.D. Fla. 1994) (a party should specify the key witnesses to be called and their expected testimony when considering the convenience of the witnesses); *Laica-Bhoge v. Eli Lilly & Co.*, Case No. 6:14-cv-1286-Orl-41KRS, 2015 WL 3919515, at * 5 (M.D. Fla. June 25, 2015) ("[A] general allegation that witnesses will be necessary, without identifying those necessary witnesses and indicating what their testimony at trial will be" does not merit transfer) (quoting *J.I. Kislak Mortg. Corp. v. Connecticut Bank and Trust Co.*, 604 F. Supp. 346, 347 (S.D. Fla. 1985)).   The Defendant simply states that many of the relevant witnesses will be its own employees and officers who developed advertising strategies, contracted with Amazon, and operated the Defendant's website, and that each of these unidentified persons resides in Ohio.   Without more detailed information, the undersigned is unable to determine if any of these purported witnesses are "key" (*i.e.* necessary for trial).   *Id.*   In any event, the only witnesses the Defendant references are its own employees, and the Defendant can compel their

attendance at trial. *Trinity Christian*, 761 F. Supp. 2d at 1327. Moreover, while the Plaintiff does not identify any potential witnesses, it is more than likely one or more of the Plaintiff's employees (who reside in Florida) will testify about the Marks at issue, the alleged infringement, and the harm caused by the alleged infringement. It stands to reason that any inconvenience potentially suffered by the Defendant's witnesses would simply be shifted over to the Plaintiff's witnesses if the case was transferred to Ohio. This factor is therefore neutral.

### 2. The Location of Relevant Documents and Ease of Access to Sources of Proof

The Defendant argues that "all the evidence" is located at its headquarters in Ohio, therefore it would be more convenient to litigate this case in Ohio. (Doc. 12 at 16). This is all the Defendant says on this point. However, there is bound to be evidence sought and used in this case that is located in Florida, including evidence related to the Plaintiff's use of the Marks and the harm caused by the alleged infringement. Moreover, "[m]odern technology largely neutralizes traditional obstacles to providing relevant documents and access to proof," thereby reducing the significance of this factor. *Watson v. Community Education Centers, Inc.*, No. 2:10–cv–00778–36SPC, 2011 WL 3516150, at *5 (M.D. Fla. Aug. 11, 2001) (citing *Trinity Christian* 716 F. Supp. 2d at 1327–28). *See also Weintraub v. Advanced Corr. Healthcare, Inc.*, 161 F. Supp. 3d 1272, 1283 (N.D. Ga. 2015) ("Since the predominance of electronic discovery in the modern era, most courts have recognized that the physical location of relevant documents is no longer a significant factor in the transfer inquiry."). Under these circumstances, this factor is neutral.

### 3. The Convenience of the Parties and Their Relative Means

This factor is also neutral. "Where a transfer merely shifts the inconvenience from one party to another, Plaintiff's choice of forum should remain." *Eye Care Int'l, Inc. v. Underhill*, 119 F. Supp. 2d 1313, 1319 (M.D. Fla. 2000). "The Court places little weight on the domicile of

corporate defendants and their place of incorporation," *Am. Safety Cas. Ins. Co. v. Bio–Tech Solutions, Inc.*, No. 1:05–1cv–3152–JEC, 2007 WL 951529, at *4 (N.D. Ga. Mar. 26, 2007) (quoting *Grey v. Cont'l Mktg. Assocs., Inc.*, 315 F.Supp. 826, 831–32 (N.D. Ga. 1970)), or on an "alleged hardship [that is] unsupported by way of proof or affidavit," *Grey*, 315 F.Supp. at 831. *See also Garay v. BRK Electronics*, 755 F. Supp. 1010, 1012 (M.D. Fla. 1991) (noting that "litigation is always inconvenient to some party or witness").   There is no question that a nonresident party, like the Defendant, will experience some inconvenience by litigating a case in a different state. However, by transferring the case to Ohio, that same level of inconvenience will be merely shifted over to the Plaintiff.   Moreover, the Defendant has not presented any evidence that sheds any light on how much of an inconvenience it will be to litigate in Florida, nor has it presented any evidence concerning its relative financial means.   Indeed, the Defendant apparently admits that this factor should be given little weight in the analysis.   (Doc. 12 at 16).

### 4.   The Locus of Operative Facts

Given the Defendant's assertions that all of the evidence and relevant witnesses reside in Ohio, it is safe to presume that at least some of the actions giving rise to this case occurred in that state.   However, the publication of the infringing advertisements occurred on a website that is accessible nationwide, and the Plaintiff has alleged (and the undersigned agrees) that the effects of any of the Defendant's actions were felt by the Plaintiff in Florida.   Thus, this factor is, at best, neutral.

### 5.   The Availability of Process to Compel the Attendance of Unwilling Witnesses

The Defendant has not presented any evidence that its employees will be unwilling to travel to Florida for a deposition or trial.   Accordingly, the Defendant has not shown that this factor weighs in favor of transfer.   *See Mason*, 146 F. Supp. 2d at 1362 (finding that a failure to "show

that the witnesses would be unwilling to testify and that compulsory process would be necessary" weighs against transfer).   Further, as discussed above, the only witnesses that the Defendant points to are its employees, who could be made available by the Defendant.

### 6.   A Forum's Familiarity with the Governing Law

The Plaintiff has asserted two claims under the Lanham Act and two Florida state law claims. (Doc. 1 at 13-16).   There is no question that this Court and the district court in Ohio are equally knowledgeable about claims brought under the Lanham Act.   However, it is likely that the Middle District of Florida is more familiar with the law governing the Plaintiff's Florida state law claims, such that this factor weighs against transfer.

### 7.   The Weight Accorded a Plaintiff's Choice of Forum

The Defendant argues that little weight should be accorded to the Plaintiff's choice of forum because the relevant evidence and witnesses are located in Ohio.   (Doc. 12 at 16).   The undersigned disagrees.   "[A] plaintiff's choice of forum is entitled to greater deference when the plaintiff has chosen the home forum."   *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255 (1981). That choice "should not be disturbed unless it is clearly outweighed by other considerations." *Robinson v. Giarmarco & Bill, P.C.*, 74 F.3d 253, 260 (11th Cir. 1996) (quoting *Howell v. Tanner*, 650 F.2d 610, 616 (5th Cir. 1981)).   As discussed above, the Defendant's conclusory and unsupported arguments do not show that this factor should be given less weight in this case. Therefore, this factor weighs against transfer.

### 8.   Trial Efficiency and the Interests of Justice

Other than stating that the Northern District of Ohio "is the proper venue both in terms of justice and expeditiously resolving this matter," the Defendant makes no argument or points to any evidence as to these remaining two factors.   (Doc. 12 at 16).   There is nothing before the Court

that would even suggest that a trial in Ohio would be resolved any more expeditiously than a trial in Florida.  These last two factors shed no meaningful light on the appropriateness of a transfer, and are neutral.

In sum, all but three of the factors are neutral in the transfer analysis.   Of the three that carry any substantial weight – the need to compel attendance of unwilling witnesses, the plaintiff's choice of forum, and the forums' familiarity with the governing law – all three support a finding that transfer to Ohio is not appropriate.   The Defendant has failed to show that its requested forum is more convenient.   Therefore, the undersigned respectfully recommends that the Defendant's request to transfer be denied.

## III.   Conclusion

Accordingly, it is respectfully **RECOMMENDED** that the Motion (Doc. 12) be **DENIED**.

## <u>NOTICE TO PARTIES</u>

A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions.   A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation.   *See* 11th Cir. R. 3-1.

Recommended in Orlando, Florida on September 16, 2019.

**LESLIE R. HOFFMAN**
**UNITED STATES MAGISTRATE JUDGE**

Copies furnished to:

Presiding District Judge
Counsel of Record
Unrepresented Party

Courtroom Deputy