UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

**DELTONA TRANSFORMER
CORPORATION,**

**Plaintiff,**

**v.**                                              **Case No.  6:19-cv-308-CEM-LHP**

**THE NOCO COMPANY,**

**Defendant.**
_____/

**ORDER**

THIS CAUSE is before the Court on the issue of disgorgement of profits
following a jury trial on liability and damages, (*see generally* Min. Entries, Doc.
Nos. 294, 296, 299, 305, 310, 311, 313), and a bench trial on disgorgement, (*see
generally* Min. Entry, Doc. 381). The parties each submitted proposed findings of
fact and conclusions of law. (Def.'s Proposed Order, Doc. 390; Pl.'s Proposed Order,
Doc. 392). Plaintiff also filed a Motion for Permanent Injunction (Doc. 338), to
which Defendant filed a Response (Doc. 367). As set forth below, Plaintiff will be
granted disgorgement of Defendant's profits in the amount of $12,135,943.70, and
the Motion for Permanent Injunction will be granted in part and denied in part.

## I.   BACKGROUND

Plaintiff is the owner of various trademarks, including the marks BATTERY TENDER and DELTRAN BATTERY TENDER ("Plaintiff's Marks"). (*See generally* Trademark Registrations, Pl. Exs. 1A, 1B, 1E, Doc. Nos. 318-1, 318-2, 318-3). This case arises from Defendant's infringement of Plaintiff's Marks. At trial, Plaintiff presented evidence that throughout the relevant time period, between 2014 and 2020, Defendant intentionally infringed Plaintiff's Marks by engaging in a campaign to confuse customers and appropriate Plaintiff's goodwill. At the conclusion of trial, the jury found in favor of Plaintiff on its Lanham Act claims, common law trademark claim, and Florida Deceptive and Unfair Trade Practices Act claim. (Verdict, Doc. 315, at 1–5). The jury awarded actual damages in the amount of $1,300,000, (*id.* at 4), and punitive damages in the amount of $5,750,000, (Punitive Damages Verdict Form, Doc. 317, at 1).

The Court then conducted a bench trial on the issue of disgorgement of profits. (*See generally* Min. Entry, Doc. 381). Plaintiff has also moved for the issuance of a permanent injunction. (*See generally* Doc. 338). The Court will address each in turn.

## II.   DISGORGEMENT

Because Plaintiff prevailed on its claims under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), it is entitled, "subject to the principles of equity, to recover . . . [D]efendant's profits" in addition to the damages awarded by the jury.

15 U.S.C. § 1117(a).[1] However, "disgorgement of a defendant's profits in a trademark infringement case is equitable in nature and does not carry with it a right to a jury trial." *Hard Candy, Ltd. Liab. Co. v. Anastasia Beverly Hills, Inc.*, 921 F.3d 1343, 1359 (11th Cir. 2019). Thus, the issue of disgorgement of profits is currently before the Court as the factfinder.[2] The Court must first determine whether Plaintiff has shown entitlement to disgorgement of profits, and if so, the amount of profits that must be disgorged.

"An accounting of a defendant's profits is appropriate where: (1) the defendant's conduct was willful and deliberate, (2) the defendant was unjustly enriched, or (3) it is necessary to deter future conduct." *Playnation Play Sys. V. Velex Corp.*, 924 F.3d 1159, 1170 (11th Cir. 2019). All three categories exist here, but because Defendant's infringement was so blatantly willful, the Court need only address that category.

The Eleventh Circuit has "described a willful violation of a trademark occurring where the infringer was 'knowingly and deliberately cashing in upon the good will of [the infringed].'" *Optimum Techs., Inc. v. Home Depot U.S.A., Inc.*, 217 F. App'x 899, 903 (11th Cir. 2007) (quoting *Burger King v. Mason*, 855 F.2d 779,

---

[1] There are exemptions that are inapplicable here. 15 U.S.C. § 1117(a) (noting that the statements therein are "subject to the provisions" of 15 U.S.C. §§ 1111 and 1114).

[2] As the Court made clear to the parties at the June 24, 2021 Hearing, (*see generally* Min. Entry, Doc. 361), the bench trial was a continuation of the jury trial and the Court considered all evidence presented in both phases of the trial as the record before it.

781 (11th Cir. 1988)). Here, the evidence of willful infringement is abundant. In 2014 and throughout the ongoing infringement, Plaintiff's Battery Tender brand was well known for its battery chargers and maintainers, particularly within the powersport industry. (*See, e.g.*, Jury Trial Vol. 1 Tr., Doc. 339, at 196 (indicating that Plaintiff was selling over a million battery chargers per year in 2014); Jury Trial Vol. 3 Tr., Doc. 343, at 91 (explaining that based on a brand survey, Plaintiff's brand recognition was extremely strong within the powersport industry); Jury Trial Vol. 4 Tr., Doc. 348, at 151 (acknowledging that Plaintiff "was one of the top brands in the industry" in 2013 and 2014); Jury Trial Vol. 6 Tr., Doc. 356, at 45 (Defendant's President stating that Plaintiff was one of the "biggest competitors in the battery charger space")).

As of January 2014, Defendant was contemplating an advertising strategy using "battery tender" in its marketing and claiming that this phrase was generic. (Jan. 28, 2014 Email, Def. Ex. 19, Doc. 319-3, at 1). Defendant followed through on this strategy, placing advertisements on Amazon.com using Plaintiff's Marks. (Jury Trial Vol. 2 Tr., Doc. 341, at 54–60; *see generally* Amazon Ads., Pl. Exs. 47, 49, 50, 52, Doc. Nos. 318-27, 318-28, 318-29, 318-30). Defendant also strategically used the term battery tender when communicating with customers, representing that Defendant's products were battery tenders despite that term being Plaintiff's protected trademark and Defendant having no affiliation with Plaintiff. (Doc. 341 at

61–63; Heiser Dep., Doc. 327-1, at 12 (Defendant's sales representative explaining that she had told customers that Defendant "sells battery tender products"); Doc. 348 at 154 (Defendant's Vice President of Sales for the Americas stating that he was actively telling customers that Defendant "sells battery tender products")).

These actions were taken even though Defendant knew that Battery Tender was Plaintiff's trademarked brand. Indeed, Defendant's high-ranking executives admitted that they were very familiar with Plaintiff's brand at least by 2014. (Doc. 348 at 151 (Defendant's Vice President of Sales for the Americas acknowledging awareness of Plaintiff's brand in 2013 and 2014); Underhill Dep., Doc. 327-3, at 18 (Defendant's Chief Creative Officer referring to Plaintiff in 2014 by its "Battery Tender" brand and explaining that he "for sure" knew that it was Plaintiff's brand because Plaintiff was one of Defendant's "core competitors" who he knew "very well")). Further, on July 1, 2015, Plaintiff sent the first in a series of cease and desist letters to Defendant, explaining that battery tender was protected by trademarks and demanding that Plaintiff stop improperly using Plaintiff's Marks. (July 1, 2015 Letter, Pl. Ex. 61A, Doc. 318-38, at 1).

Apparently, in light of the potential liability for infringing Plaintiff's Marks, Defendant approached Plaintiff about acquiring the Battery Tender brand. (Sept. 15, 2016 E-mail, Pl. Ex. 62A, Doc. 318-44, at 1; Doc. 327-3 at 17 (explaining that Defendant wanted to acquire companies like Plaintiff to "accelerate [Defendant's]

products on the market by acquiring a company with" established distribution channels, which would be "faster than . . . the long, hard way")). Plaintiff was not interested in being acquired by Defendant. (Doc. 343 at 124–26).

The evidence at trial was clear—Defendant could not convince Plaintiff to sell, so Defendant decided to steal Plaintiff's goodwill while also spreading disinformation within the industry in an attempt to render Plaintiff's Marks invalid as generic to avoid liability for its actions. (*See id.* (describing ongoing efforts by Defendant to acquire Plaintiff that were rejected); Doc. 356 at 76–77 (stating that Defendant attempted to acquire Plaintiff in 2016, 2017, and 2018)). Evidence of Defendant's efforts to render Plaintiff's Marks generic was thoroughly discussed at the jury trial, and the argument that they had become generic—despite Defendant's concerted campaign to make them generic—was soundly rejected by the jury, (*see* Doc. 315 at 1–3), so the Court need not discuss that now. The focus here is on Defendant's continued infringement and the willfulness of that infringement.

Defendant was clearly taking these steps with intention and animus towards Plaintiff. (*See, e.g.*, Feb. 26, 2016 Slack Messages, Pl. Ex. 123, Doc. 318-85, at 4 (Plaintiff's Chief Creative Officer stating that he was "[w]orking on a rendering that will [make] the battery tender pee itself"); Feb. 27, 2017 Slack Messages, Pl. Ex. 128, Doc. 318-89, at 1 (stating that Defendant should include "Fuck Battery Tender" in its advertising); Nov. 12, 2018 Slack Messages, Pl. Ex. 134, Doc. 318-92, at 7–8

(responding to a proposed marketing slogan that used Plaintiff's Marks with "I like that one because it's kind of passive aggressive" and a "joy" emoji and stating "I envision them sending us a nasty note like 'ummm excuse me?!?!'" and a response of a rolling on the floor laughing emoji)).

For example, in 2018, despite having received additional cease and desist communications due to Defendant's ongoing trademark infringement, (July 10, 2018 Letter, Pl. Ex. 61D, Doc. 318-40, at 1–3 (detailing "prior correspondence and communications" regarding these issues, providing screen shots of infringing advertisements, and demanding that Defendant immediately cease using Plaintiff's Marks)), Defendant's marketing team was developing and implementing slogans using "battery tender" at the direction of Defendant's President, Jonathan Nook, (Doc. 318-92 at 5–6 (brainstorming slogan ideas using "tender" and then stating: "I picture J wanting us to refer to 'Battery Tender' in the messaging just like we have for the current ad messaging").[3]

---

[3] At trial Nook attempted to feign ignorance of who "J" was in the previous reference, (Doc. 356 at 120–21), but it is clear that the reference was to his first name, Jonathan. Nook's testimony to the contrary was so astonishingly not credible that the Court even commented on it at the time, outside the presence of the jury, in addressing an objection as to misstatement of testimony. (*Id.* at 121–22 ("I'm not sure you can misstate someone's testimony that has differed so much. I mean, I'm taking notes on—he's saying things that are inaccurate from what he said on your direct examination. So the reason I'm having trouble with your objection is, I don't know which version of what your client's saying you want me to rule on, in terms of the Plaintiff misleading him. So I don't know. He's given so many versions of his testimony just today. I really don't know—I don't really know where to go with that objection."). *See also id.* at 120 (stating that there is no one else on Defendant's advertising team whose name begins with "J"); Doc. 327-3 at 19 (Defendant's Chief Creative Officer stating that Nook "writes all the content" for Amazon and is responsible for the product descriptions on Defendant's website).

The infringement went even further in 2019 when Defendant used Plaintiff's Marks in its product descriptions on Amazon.com in the days leading up to Amazon's Prime Day, (Doc. 343 at 69–70, 151–52; Doc. 356 at 136, 138–39),[4] which is one of the biggest sales events of the year for that platform, (Doc. 343 at 38). Not only would including Plaintiff's Marks in the product description drive traffic to Defendant's products, (*id.* at 70), it would save Defendant money because bidding on keywords during Amazon Prime Day is much more expensive, (*id.* at 38).

The above discussion only touches on a portion of the evidence presented demonstrating that Defendant engaged in a systematic plan to infringe Plaintiff's Marks and steal Plaintiff's goodwill; the Court could cite nearly the entire trial transcript.[5] However, further elaboration at this point would be excessive.

---

[4] Nook claimed that these descriptions were a mistake and were voluntarily taken down within twenty-four hours, (Doc. 356 at 136–37), but Plaintiff's representative gave detailed testimony regarding the fourteen separate product descriptions and the process he had to go through to have Amazon remove them, (Doc. 343 at 150–54). Nook's testimony was not based on firsthand knowledge, (Doc. 356 at 136–37), and is not credible.

[5] This includes much of the evidence presented by Defendant, particularly the testimony of Nook, Defendant's President, who was so dishonest and contradictory on the stand that it became apparent that he was attempting to cover up his wrongdoings during his live testimony at trial. (*See, e.g.*, Doc. 356 at 68–71 (testifying regarding his education, where it was pointed out that at various times—most of them under oath—that Nook claimed to have a minor in marketing, a major in marketing, to have graduated in 1999, to have graduated in 2001, and that he could not remember when he graduated); *id.* at 98–101 (claiming that he did not write a particular e-mail and then reluctantly conceding once confronted with evidence that he did); *id.* at 115–19 (claiming that there were no communications with Plaintiff regarding trademarks for a three-year period and, upon being confronted with evidence that Defendant's attorney was in frequent communications with Plaintiff's attorney in an effort to settle the matter, claiming that his attorney did not pass on the settlement discussions to him and then claiming that he could not remember); Jury Trial Vol.

Plaintiff has established that Defendant's actions were willful, and therefore, it is entitled to disgorgement of Defendant's profits.[6] *See Vivid Entm't, Ltd. Liab. Co. v. J&B PB, Ltd. Liab. Co.*, No. 2:13-cv-524-FtM-29DNF, 2015 U.S. Dist. LEXIS 3121, at *6, 16 (M.D. Fla. Jan. 12, 2015) (finding the defendant's infringement to be willful under a related provision where the defendant was "using and imitating the Trademarks in the operation and promotion of" its own business and continued to do so even after receiving a cease and desist letter from the plaintiff); *Tran v. Thu Thi Dinh*, No. 3:10-cv-1142-J-37JBT, 2012 U.S. Dist. LEXIS 201029, at *20 (M.D. Fla. Jan. 5, 2012) (finding under a related provision of 1117(a) that the defendant engaged in "willful and intentional conduct" when the plaintiff knew of the defendant's mark and continued to infringe even after cease and desist letters).

Having concluded that Defendant's infringement was willful, the Court now turns to the issue of calculating Defendant's profits. "In assessing profits the plaintiff

---

7 Tr., Doc. 358, at 120–24 (claiming ignorance of nearly all of Defendant's financials, including claiming to have no idea about Defendant's bank accounts, despite admitting that he makes financial decisions for Defendant and asserting on direct that he was intimately involved all of Defendant's affairs).

[6] To the extent Defendant argues that Plaintiff is not entitled to disgorgement because Plaintiff acted with unclean hands or otherwise inequitably, the Court soundly rejects that assertion. Defendant has desperately tried to paint this litigation as Plaintiff being upset that Defendant was bidding on "battery tender" as a keyword on Amazon.com—something that Defendant asserts Plaintiff has done in its business practices. But, as explained thoroughly above, that is not what this litigation is about; it is about Defendant's systematic infringement of Plaintiff's Marks. Additionally, Defendant's claim that the 2015 cease and desist communications and the perceived resolution of that discrete issue somehow gave Defendant permission to infringe is, quite frankly, absurd.

shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed." 15 U.S.C. § 1117(a). "If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case." *Id.* This provision "confers broad discretion upon the district court to fashion a remedy and determine the proper relief due an injured party." *Optimum Techs.*, 217 F. App'x at 902.

Plaintiff has offered evidence of Defendant's gross sales of battery chargers from January 1, 2014, through June 30, 2020, which were $64,659,456. (Invoiced Sales, Pl. Ex. 232, Doc. 318-200, at 1; Bench Trial Tr., Doc. 386, at 76).[7] Defendant disputes that these gross sales numbers should be used. Specifically, this total represents Defendant's gross sales for its battery chargers. Defendant argues that this is the incorrect starting place, asserting that this case is only about a narrow set of advertisements on Amazon.com and attempting to limit the breadth of profits to those. However, as discussed above, Defendant's infringement far exceeded this narrow scope. As such, Defendant's argument—and its expert's analysis encompassing that argument—is not persuasive or credible. Thus, Defendant's gross sales numbers for its battery chargers are the correct starting place.

---

[7] Plaintiff also provided estimates for Defendant's gross sales subsequent to the timeline in the document cited above. (*See, e.g.*, Doc. 386 at 98).

However, based on the evidence and arguments presented, the full time period from January 2014 through June 2020 is not appropriate for inclusion in the disgorgement calculation. Plaintiff concedes that the first infringing advertising campaign began on December 11, 2014, (Doc. 386 at 29), but Plaintiff's disgorgement calculations include all of 2014 because the only data Defendant produced on this matter, despite Plaintiff's attempts to obtain more detailed information during discovery, (*see* July 7, 2020 Order, Doc. 138, at 4), is not broken down in any manner—it only has gross sales for the entire year, (Doc. 386 at 29–30). Defendant argues that it would be fundamentally unfair to award profits for the entire year of 2014 when it is clear that the infringement did not begin until the last month of 2014. The Court agrees. And, while the Court has not been given precise calculations, Defendant's Chief Financial Officer testified that battery charger sales do not "change from month to month dramatically" but that "typically the fourth quarter is [Defendant's] best quarter." (*Id.* at 97). Based on this representation, and under the principles of equity within which the Court is operating for disgorgement, it is appropriate to simply divide the 2014 gross sales—$3,614,202, (Doc. 318-200 at 1)—by twelve in order to estimate the gross sales numbers for the infringing period of December 2014. That calculation equates to $301,183.50 for the month of December, the single month during 2014 in which Defendant was infringing.

Defendant also asserts that any disgorgement should only extend, at most, through March 2020 because there is evidence that Defendant stopped infringing by that point. (Doc. 356 at 36–37 (testifying that Defendant had stopped its infringement activities in "March, 2020"); *see also* Doc. 341 at 204 (testifying that Plaintiff had "take[n] back its brand space" "[a]round February, 2020")). While Plaintiff argues that the disgorgement should continue through the date of the bench trial, the evidence Plaintiff relies on is simply the fact that Defendant's Chief Financial Officer—who is not a part of the sales team—was unaware of whether Defendant sent out any guidance to its sales staff with regard to the use of Plaintiff's Marks. (Doc. 386 at 83–84). This is not enough to establish that the infringement was ongoing sufficient to award disgorgement of profits in light of the other evidence on the record. Thus, the disgorgement period will end as of March 2020, and the Court will engage in a similar estimation for this time period as it did for the 2014 gross sales numbers. The gross sales numbers provided for 2020 are only for January 2020 through June 2020—six months totaling $9,974,189, (Doc. 318-200 at 1)—and the disgorgement period is only three of those months, so the Court will divide that amount in half, resulting in $4,987,094.50.

The remaining period of disgorgement is undisputed—the entirety of the years from 2015 through 2019. The gross sales for this period were $51,071,064. Adding this number to the reduced gross sales calculations from 2014 totaling $301,183.50

and from 2020 totaling $4,987,094.50 results in total gross sales of $56,359,342 during the disgorgement period of December 2014 through March 2020.

Since Plaintiff has met its burden of demonstrating Defendant's sales, and the relevant timeframe has been established, it is next Defendant's burden to establish any relevant deductions. Defendant urges the Court to consider a document entitled "The NOCO Company and Subsidiaries Consolidated Statements of Income" (Def. Ex. 46), which purportedly provides percentages for different types of costs and expenses incurred by Defendant. There are many problems with this document. First, it is a summary document and the underlying data was not produced, so there is no way to review the accuracy of the numbers.[8] Second, the document itself is redacted, so there are only percentages, not actual sales numbers. And perhaps most importantly, this document addresses the sales and costs numbers across all of Defendant's business—it is not tailored to Defendant's battery charger sales. (Doc. 386 at 87–90, 121–26). For example, advertising costs relating solely to Defendant's jump starter sales are included in these percentages, (*id.* at 121), as well as liability and property insurance for the company as a whole, (*id.* at 122). "To allow a deduction from gross profits, Defendant must establish that the claimed expenses actually relate to the sale and production of the infringing product." *Burger King*

---

[8] Plaintiff objected to the admission of this document on this basis. But because the Court finds that the document carries no weight in its decision, it will consider the document.

*Corp. v. Pilgrim's Pride Corp.*, 934 F. Supp. 425, 426 (S.D. Fla. 1996) (citing *Maltina Corp. v. Cawy Bottling Co., Inc.*, 613 F.2d 582, 586 (5th Cir. 1980)); [9] *see also Abbott Labs. v. Unlimited Bevs., Inc.*, 218 F.3d 1238, 1242 (11th Cir. 2000) (affirming the district court's refusal to deduct costs because "they would have been incurred even without the sale of the prohibited product"). This document fails to provide any usable information as to any relevant deductions.

Defendant also sought to introduce a document purporting to represent deductions taken for sales on Amazon.com. (Amazon Deductions, Def. Ex. 45). Again, there are questions regarding this document's admissibility given that it was created in anticipation of litigation and the underlying information was not disclosed to Plaintiff. Regardless, the document has no utility to this analysis. As noted above, the relevant universe of sales information here is all of Defendant's battery chargers—not only those sold on Amazon.com. Defendant has not provided any information as to what portion of the sales were made on Amazon.com or via some other venue, such as brick and mortar stores or through Defendant's own website. Accordingly, even if the expenses referenced in this document could, theoretically, be deducted, such deductions would only be for products sold on Amazon.com, and the Court has no information as to what portion of the total sales would fall into this

---

[9] Cases decided by the Fifth Circuit prior to October 1, 1981 are binding on this Court. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981).

category. Thus, Defendant has not met its burden to show that the deductions contained in Exhibit 45 should be considered.[10]

At this point, it is worth noting that the Court would be well within the limits of the law to order the disgorgement of all of Defendant's profits from battery chargers from December 2014 through March 2020. However, as explained above, the Court must also act within the principles of equity, and even though Defendant has not provided any specific cost deductions, clearly its gross sales numbers do not represent its profits. Defendant's President testified that its profit margin on sales was approximately thirty-five percent. (Jury Trial Vol. 7 Tr., Doc. 358, at 128). Additionally, the evidence indicates that Defendant did not start infringing on Plaintiff's Marks until December 2014. So, Defendant gets the benefit of the battery charger sales that it had established prior to infringement. In other words, the Court will take thirty-five percent of Defendant's gross sales numbers as Defendant's total profits. It will then reduce those profits each year by Defendant's 2014 annualized profits from the first eleven months of 2014, which based on the evidence before the Court were earned without infringement. These calculations are set forth below and result in a disgorgement of profits of $12,135,943.70.

---

[10] Plaintiff also objected to the admission of Defendant's Exhibits 55 and 56. However, these documents also pertain solely to sales on Amazon.com and, for the same reasons discussed above, do not provide any basis for deductions.

| | Dec. 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | Jan.-Mar. 2020 | Total |
|---|---|---|---|---|---|---|---|---|
| Def.'s Gross Battery Charger Sales | $301,183 50 | $5,021,551 00 | $8,197,486 00 | $10,384,780 00 | $12,508,896 00 | $14,958,351 00 | $4,987,094 50 | $56,359,342 00 |
| Def.'s Profit Margin | 35% | 35% | 35% | 35% | 35% | 35% | 35% | N/A |
| Def.'s Gross Battery Charger Profits | $105,414 23 | $1,757,542 85 | $2,869,120 10 | $3,634,673 00 | $4,378,113 60 | $5,235,422 85 | $1,745,483 08 | $19,725,769 70 |
| Def.'s Gross Battery Charger Profits in excess of Def.'s 2014 Annualized Gross Battery Charger Profits | $105,414 23 | $492,571 85 | $1,604,149 10 | $2,369,702 00 | $3,113,142 60 | $3,970,451 85 | $480,512 08 | $12,135,943 70 |

## III.   PERMANENT INJUNCTION

Plaintiff seeks a permanent injunction under 15 U.S.C. § 1116(a).[11] Section 1116(a) gives courts the "power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office or to prevent a violation under subsection (a), (c), or (d) of section 43 [15 USCS § 1125]." "According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Specifically, "[a] plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Id.*

---

[11] Plaintiff also argues that it is entitled to an injunction under section 495.141(1) of the Florida Statutes. That section is substantively similar to § 1116(a), and because Plaintiff is entitled to an injunction under § 1116(a), the Court need not address any alternative basis.

### A.    Irreparable Harm

Where there has been a "finding of a violation" of, *inter alia*, 15 U.S.C. § 1125(a)—as there has been here—the plaintiff is "entitled to a rebuttable presumption of irreparable harm." 15 U.S.C. § 1116(a). Despite this clear statutory directive, Defendant argues that the presumption should not be applied and Plaintiff should have to make more of a showing of irreparable harm.

First, Defendant argues that the jury did not specify which of Plaintiff's two trademarks Defendant infringed. Defendant is incorrect. The interrogatories on the Verdict Form specifically asked if Plaintiff had demonstrated a likelihood of confusion as to each separate trademark. (Doc. 315 at 3–4). Second, Defendant argues that because Plaintiff did not seek a preliminary injunction in this case, it cannot now seek a permanent injunction because the delay militates against a finding of irreparable harm. The case cited by Plaintiff is discussing the issuance of a *preliminary* injunction and the likelihood of irreparable harm during the relatively short time period before trial. *Seiko Kabushiki Kaisha v. Swiss Watch Int'l, Inc.*, 188 F. Supp. 2d 1350, 1355 (S.D. Fla. 2002). Additionally, the presumption of irreparable harm did not apply in that case because Plaintiff did not establish a substantial likelihood of confusion—and therefore did not establish a likelihood of success on the merits. *Id.* at 1354–55; 15 U.S.C. § 1116(a) (noting that the rebuttable presumption applies to "a motion for a preliminary injunction or temporary

restraining order" only where the court finds "likelihood of success on the merits");
*see also Hi-Tech Pharm. v. Dynamic Sports Nutrition*, No. 1:16-cv-949-MHC, 2016
U.S. Dist. LEXIS 199046, at *34 (N.D. Ga. June 2, 2016) (contrasting a request for
a permanent injunction with one for a preliminary injunction and recognizing that,
unlike a preliminary injunction, "a lack of urgency in filing the injunctive-relief
motion may not 'bar a permanent injunction'").

Next, Defendant asserts that Plaintiff suffered no lost sales as a result of
Defendant's infringement, which Defendant claims shows that there was no damage
to Plaintiff's reputation. Defendant overstates the facts of this case. In the context of
a discovery dispute, Plaintiff stipulated that it was not going to seek monetary relief
based on a showing of lost sales. (Doc. 138 at 3). This was a litigation strategy, not
an admission that there were no lost sales. Further, based on the evidence of actual
customer confusion that was presented at trial—evidence that the jury credited—it
is clear that Plaintiff's reputation and goodwill was impacted because its brand was
being co-mingled with Defendant's products. *See Mixed Fighting All. Promotions,
Inc. v. De La Noval*, No. 11-21107-CIV, 2011 U.S. Dist. LEXIS 168032, at *32
(S.D. Fla. Apr. 14, 2011) (indicating that the plaintiff's "loss of control of [its]
reputation and the potential for injury to its business and goodwill constitutes
irreparable injury").

Finally, Defendant asserts that there is no ongoing infringement to enjoin. While the Court determined in its disgorgement analysis that there was not evidence of ongoing infringement after March 2020, that does not preclude a determination that there is a likelihood of irreparable harm absent an injunction here. Specifically, as laid out in detail above, Defendant has shown that it is willing to intentionally infringe on Plaintiff's Marks and engage in other unscrupulous behavior in its business. Voluntary cessation of such blatant infringement in the face of litigation does not reassure the Court that there is no risk of further infringement in the future. *See F.A.C.E. Trading, Inc. v. Famiano*, No. 8:05-cv-1740-T-23TBM, 2006 U.S. Dist. LEXIS 97715, at *40 (M.D. Fla. Jan. 10, 2006) ("Defendants cannot deny that they acted willfully in this instance, and although they claim they have voluntarily ceased [the infringing activity], the potential for ongoing and recurrent violations exists."); *see also Nat'l Ass'n of Bds. of Pharmacy v. Bd. of Regents*, 633 F.3d 1297, 1311–12 (11th Cir. 2011) (analyzing whether voluntary cessation of infringing behavior rendered a claim moot and determining that it did not because there were circumstances surrounding the decision to stop infringing that indicated the defendants may do so again).

Accordingly, Plaintiff has met its burden to establish irreparable harm and Defendant has failed to rebut the presumption set forth in § 1116(a).

**B.      Inadequate Remedy at Law**

"In trademark infringement actions, injunctive relief is often appropriate because: 1) 'there is no adequate remedy at law to redress infringement and [2)] infringement by its nature causes irreparable harm.'" *True Mfg. Co. v. Boys*, No. 6:16-cv-634-Orl-37GJK, 2016 U.S. Dist. LEXIS 167687, at *17 (M.D. Fla. Nov. 8, 2016) (quoting *Tally-Ho, Inc. v. Coast Cmty. Coll. Dist.*, 889 F.2d 1018, 1029 (11th Cir. 1989)); *BMW of N. Am., Inc. v. Ismail Cuhadar & Cars & More European Car Serv. Ctr.*, No. 6:14-cv-40-Orl-37DAB, 2014 U.S. Dist. LEXIS 191883, at *5 (M.D. Fla. Mar. 12, 2014) (same); *Instant One Media, Inc. v. Ezfauxdecor, LLC*, No. 1:19-cv-00540-WMR, 2022 U.S. Dist. LEXIS 182802, at *6 (N.D. Ga. July 26, 2022) ("In trademark infringement cases, it is generally recognized that there is not adequate remedy at law to redress infringement."). Despite Defendant's attestations to the contrary, there was ample proof of actual confusion and, certainly, likelihood of confusion, based on Defendant's infringement along with Plaintiff's loss of control over its reputation and goodwill. This is sufficient to establish that monetary damages in and of themselves would be inadequate. *Boulan S. Beach Master Ass'n v. Think Props., LLC*, 617 F. App'x 931, 934 (11th Cir. 2015) ("[A] remedy at law for consumer confusion or reputational damage is ordinarily inadequate, given 'the potential difficulty of proof of plaintiff's damages" and "the impairment of intangible values.").

### C.    Balance of Hardships

Defendant's only argument against the balance of hardships involves the scope of the injunction, not the issuance itself. However, the Court only intends to enjoin Defendant from engaging in behaviors that would infringe Plaintiff's Marks, and "enjoining [Defendants] from infringing [Plaintiff's] marks causes them no discernible hardship." *Hill v. Dinges*, No. 3:21-cv-165-MMH-PDB, 2021 U.S. Dist. LEXIS 191736, at *15 (M.D. Fla. Sep. 13, 2021); *see also Sream, Inc. v. Barakat Food, Inc.*, No. 16-24722-CV, 2017 U.S. Dist. LEXIS 165420, at *8 (S.D. Fla. Oct. 4, 2017) ("[A] balancing of the hardships clearly favors Plaintiff because Defendant's unauthorized use of the mark was unlawful.").

### D.    Public Interest

As to the last element, "[t]here is nothing to indicate that an injunction here would adversely affect the public interest. Enjoining illegal infringement activity and preventing consumer confusion in the marketplace serves the public interests." *Hidalgo Corp. v. J. Kugel Designs, Inc.*, No. 05-20476-CIV-JORDAN/KLEIN, 2005 U.S. Dist. LEXIS 59188, at *19 (S.D. Fla. June 9, 2005).

Accordingly, Plaintiff has satisfied its burden to show that it is entitled to a permanent injunction. However, the parties disagree as to the scope of the injunction.

## E.    Scope of the Injunction

### 1.    *Keywords*

Defendant first objects to the portion of Plaintiff's proposed injunction that would prohibit Defendant from using Plaintiff's Marks "as keywords or search terms . . . to trigger advertisements, messaging, marketing, or the display of any product offered for sale by [Defendant]." (Doc. 338 at 2–3). It is not clear under Eleventh Circuit law that merely purchasing keywords—without some other evidence of consumer confusion—is sufficient to constitute trademark infringement. *Tartell v. S. Fla. Sinus & Allergy Ctr., Inc.*, No. 12-61853-CIV-DIMITROULEAS/S, 2013 U.S. Dist. LEXIS 191404, at *16 (S.D. Fla. Jan. 25, 2013) (explaining that "[c]ourts have considered whether such [keyword] advertising violates trademark law" and that in such an analysis "the central issue is likelihood of confusion" and collecting cases where courts have found a likelihood of consumer confusion and where courts have found no likelihood of consumer confusion, depending on the specific factual use); *see also Playnation*, 924 F.3d at 1167 n.4 (noting that the Eleventh Circuit has "not yet accepted" initial interest confusion "as actionable under the Lanham Act" (citing *Suntree Tech., Inc. v. Ecosense Intern., Inc.*, 693 F.3d 1338, 1347 (11th Cir. 2012))); *USA Nutraceuticals Grp., Inc. v. BPI Sports, LLC*, 165 F. Supp. 3d 1256, 1268 (S.D. Fla. 2016) (finding that, under the facts of that case, the defendant's purchase of various keywords on Amazon [did] not create [consumer] confusion");

*EarthCam, Inc. v. OxBlue Corp.*, 49 F. Supp. 3d 1210, 1241 (N.D. Ga. 2014) (explaining that even if initial interest confusion is actionable, there must be a likelihood of confusion, which requires a factual determination based on the specific actions).

Indeed, at trial Plaintiff appeared to tacitly concede that all such uses would not constitute infringement because Plaintiff itself has engaged in this type of advertising, albeit seemingly on a much smaller scale and without the intent to infringe. (Doc. 343 at 45–46). Because it does not appear that every use of keywords in this manner would constitute trademark infringement, the Court is not inclined to issue a blanket injunction as to such actions. Additionally, using or purchasing keywords in a manner that would create a likelihood of consumer confusion is already prohibited by the remainder of the injunction, which broadly prohibits use in a manner that is likely to create such confusion. As such, this specific provision will not be included.

### 2.   *Comparative Advertising*

Defendant asserts that a portion of Plaintiff's proposed injunction would prohibit Defendant from engaging in legal comparative advertising. "[T]he use of a competitor's trademark . . . for purposes of comparative advertising is not trademark infringement as long as the advertisements do not contain misrepresentations or create a reasonable likelihood that purchasers will be confused as to the source,

identity, or sponsorship of the advertiser's product." *Syntex, Inc. v. Interpharm, Inc.*, No. 1:92-CV-03-HTW, 1993 U.S. Dist. LEXIS 10761, at *23 (N.D. Ga. Mar. 18, 1993); *see also Jim S. Adler, P.C. v. McNeil Consultants, L.L.C.*, 10 F.4th 422, 428 (5th Cir. 2021) (indicating that "legitimate comparative and contextual advertising" would not constitute infringement); *Network Automation, Inc. v. Advanced Sys. Concepts*, 638 F.3d 1137, 1148 (9th Cir. 2011) (same). Thus, the Court will narrow the proposed permanent injunction to avoid prohibiting lawful comparative advertising.

### 3.    *Types of Products and Activities*

Defendant takes issue with the proposed permanent injunction extending to what it deems products and activities that were not at issue in this case. Defendant is incorrect regarding what was at issue in this case. But regardless, the evidence of Defendant's systemic plan to infringe on Plaintiff's Marks and steal its goodwill indicates that an injunction tailored to the type of behavior exhibited at trial but including Defendant's entire company is prudent.

### 4.    *Deltran and Tender Terms*

Defendant takes issue with the proposed permanent injunction including "Deltran" and "tender" alone and with prohibiting the use of all terms at issue—i.e., the plural and singular as well as capital and lower case of "battery tender" and "tender"—arguing that it is not consistent with the jury's verdict. Defendant is

incorrect. There was abundant evidence that the use of "tender" on its own was done in a way that caused customer confusion and infringed Plaintiff's Marks. This is true for the lowercase and capital as well as singular and plural versions of the terms at issue. The Court does not need a specific jury finding on this matter—the evidence at trial was clear that these terms were used in a violative manner. Further, while there was not specific evidence that Defendant used "Deltran" on its own, the jury found that Defendant infringed Plaintiff's "Deltran Battery Tender" trademark. (Doc. 315 at 3–4). And Defendant has made abundantly clear by its previous behavior that if it is given any loophole, it will use it to infringe. Thus, these terms will be included in the permanent injunction.

### 5.  *Related Terms*

Finally, Defendant argues that the proposed terms "battery-related product," "confusingly similar variations," and "misspelling" are not sufficiently precise to identify prohibited conduct. As to battery-related product, the Court disagrees. This term is easily understandable from a commonsense standpoint. Additionally, given that Defendant's business encompasses many different aspects of battery chargers and accessories, (*see* Doc. 354 at 68–69), expanding the prohibition beyond just battery chargers is important. As to the terms "confusingly similar variations" and "misspelling," regardless of whether they are sufficiently precise, the Court finds that the inclusion of those terms is not necessary here. There is no evidence that

Defendant engaged in any kind of infringement involving variations or misspellings of Plaintiff's Marks beyond the terms laid out above.

## IV.   CONCLUSION

In accordance with the foregoing, it is **ORDERED** and **ADJUDGED** as follows:

1. Plaintiff is entitled to disgorgement of Defendant's profits in the amount of $12,135,943.70.

2. Plaintiff's Motion for Permanent Injunction (Doc. 388) is **GRANTED in part** and **DENIED in part.**

3. Defendant as well as its employees, agents, officers, directors, managers, attorneys, successors, affiliates, subsidiaries, and assigns, and all those in active concert and participation with any of the foregoing persons, and entities who receive actual notice of this Order by personal service or otherwise, whether acting directly or indirectly, are **PERMANENTLY ENJOINED** from:

    a. selling, marketing, advertising, promoting, or authorizing any third party to sell, market, advertise, or promote Defendant's products including without limitation, its battery chargers, jump starters, and battery-related products, with or using the terms "Battery Tender," "Deltran Battery Tender," "Deltran," or

"Tender" (whether such terms are uppercase, lowercase, capitalized, initial capitalized, singular, or plural, and regardless of font used), except that Defendant is permitted to engage in legal and truthful comparative advertising;

b.  making or displaying any statement, representation, or depiction that is likely to lead the public or trade to believe that Defendant's goods and services are in any manner approved, endorsed, licensed, sponsored, authorized, or franchised by or associated, affiliated, or otherwise connected to Plaintiff;

c.  using or authorizing any third party to use any false description, false representation, or false designation of origin, or any marks, names, words, symbols, or devices, that falsely associate Defendant's business, goods, and/or services with Plaintiff or tend to do so; and

d.  aiding, assisting, or abetting any other individual or entity from doing any act prohibited herein.

4.  Plaintiff's Motion for Permanent Injunction is otherwise **DENIED.**

5.  The Court retains jurisdiction over the construction, enforcement, and modification of the permanent injunction.

6.  Plaintiff's Motion to Schedule a Post-Trial Status Conference (Doc. 417) is **DENIED as moot.**

7.  The Clerk is directed to enter judgment in favor of Plaintiff and against Defendant in the amount of $19,185,943.70[12] and thereafter close this case.

**DONE** and **ORDERED** in Orlando, Florida on September 29, 2023.



CARLOS E. MENDOZA
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record

---

[12] This amount represents $1,300,000 in actual damages, $5,750,000 in punitive damages, and $12,135,943.70 in disgorgement of profits.